**UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Plaintiff,

v.

MIA AESTHETICS CLINIC ATL
LLC, and MIA AESTHETICS
SERVICES, LLC,

Defendants.

Civil Action No.:
1:24-cv-03407-MLB-JCF

**DEFENDANTS' RESPONSE TO PLAINTIFF EEOC'S
OBJECTIONS TO DEFENDANTS' SEPTEMBER 18, 2025
SUPPLEMENTAL PRODUCTION OF DOCUMENTS**

Defendants Mia Aesthetics Clinic ATL LLC and Mia Aesthetics Services,

LLC ("Defendants"), by and through its attorneys, hereby file this Response to

Plaintiff EEOC's Objections To Defendants' to Defendants' September 18, 2025

Supplemental Production of Documents [Doc No. 54] and state as follows.

**INTRODUCTION AND BACKGROUND**

Plaintiff EEOC's objections to Defendants' supplemental production are as

baseless as they are brazen. After dragging Defendants through multiple rounds of

discovery disputes and a costly court-ordered e-discovery exercise—all to confirm

what Defendants had already truthfully reported—the EEOC now effectively concedes that Defendants do not have possession or control over documents it sought. Yet, rather than accept reality, the EEOC audaciously demands that the Court *punish* Defendants for this absence of data, accusing them of spoliation and bad faith with *zero* evidence to support such claims.

This marks a line-in-the-sand moment. Defendants have fully complied with the Court's August 18, 2025 Order [Doc. No. 51] and have gone above and beyond to locate any conceivable remaining information. The EEOC's abusive tactics—its ever-escalating and factually unfounded demands, its indifference to technical reality, and its zeal to tarnish Defendants with accusations of "spoliation"— have now crossed into absurd territory. The Court should put an end to the EEOC's tactics based on mere inuendo.

EEOC seek a series of adverse inferences under Rule 37 based on Mia Aesthetics' failure to produce documents. The responsive documents in Mia Aesthetics' possession, custody or control have, in fact, been produced. The documents that EEOC requested, and that have not already been produced, do not exist in Mia Aesthetics' files. Defendants have made extensive, good-faith efforts to locate them and have produced every document in its possession. Thus, EEOC's central argument seeking to invoke sanctions under Rule 37 is simply improper.

There are no circumstances under which Rule 37 requires a party to produce documents that do not exist.

EEOC also argues that Mia Aesthetics failed to comply with 29 C.F.R. § 1602.14, requiring the company to maintain certain personnel records, and therefore, seeks the same series of adverse inferences. However, such inferences are not available under §1602.14, because EEOC cannot establish the required elements. Specifically, it cannot show (1) that the documents were personnel files, (2) that the documents are relevant, (3) that Mia Aesthetics' failure to produce them resulted in prejudice, or (4) that Mia Aesthetics engaged in any bad faith destruction of documents.

In fact, the record disproves the EEOC's narrative. Ms. Webb was employed by Mia Aesthetics Clinic ATL LLC from April 2021 until August 16, 2021, when she separated from the company. Mia Aesthetics preserves "personnel or employment records" for each employee for the period required by law. Personnel records include offer letters, disciplinary notices, accommodation requests and responses, performance reviews, termination documentation, and similar employment matters. Personnel or employment records does not include every piece of data an employee generates in the course of their work, such as routine internal emails, chat messages, or system usage logs, unless those materials are known to play a role in a personnel decision. In other words, internal communications and

ancillary data (like emails, Slack chats, Google Voice data, or raw Salesforce usage records) are not treated as part of an employee's personnel file or employment records, absent a specific reason to do so.

When Ms. Webb left her employment, Mia Aesthetics applied its retention and account management policies to her as it uniformly did to all employees. In 2021 (when Ms. Webb was employed), whenever any employee left employment, whether due to resignation or termination, it was standard procedure to secure and retain the employee's personnel file as described and to deactivate the employee's access to company systems (email, messaging, and other platforms) in a timely manner. This routine is a matter of cybersecurity, confidentiality, and general standard practice in cutting out unnecessary expenditures, and was not intended to delete or destroy evidence. It simply places the account in an inactive status in line with normal IT protocols. Mia Aesthetics did not single out Ms. Webb for special data deletion; rather, all former employees' accounts are handled in the same prudent way, and their core HR files are preserved as required.

Mia Aesthetics applied its retention and account management policies uniformly to all employees. In 2021, when Ms. Webb was employed, whenever any employee left employment, whether due to resignation or termination, it was standard procedure to secure and retain the employee's personnel file as described and to deactivate the employee's access to company systems (email, messaging, and

-4-

other platforms) in a timely manner. This routine is a matter of cybersecurity, confidentiality, and general standard practice in cutting out unnecessary expenditures, and was not intended to delete or destroy evidence. It simply places the account in an inactive status in line with normal IT protocols. There is no evidence that Mia Aesthetics singled out Ms. Webb for special data deletion.

Ms. Webb was employed by Mia Aesthetics Clinic ATL LLC from April 2021 until August 16, 2021, when she separated from the company. During her tenure, Ms. Webb requested an accommodation to work remotely due to personal circumstances. The company engaged in an interactive process regarding this request. Ultimately, when a fully remote arrangement was not granted, Ms. Webb voluntarily resigned rather than continue with the interactive process or pursuant to the offered accommodations.

In keeping with Mia Aesthetics' retention policy and practice, Mia Aesthetics preserved all of Ms. Webb's personnel records and all documents directly related to her accommodation request and separation, including her initial hiring documents, communications between Ms. Webb and HR and management concerning her request for a reasonable accommodation (remote work) in 2021, the employer's written responses to Ms. Webb addressing her accommodation request, outlining the accommodations considered or offered, and documenting the outcome of that process, and documentation of Ms.

Webb's resignation and termination of employment, including internal records indicating the date and manner of her separation. It did so to fulfill its preservation requirements.

During Ms. Webb's employment, she, like other employees, had access to various digital platforms—a Company-provided email account, Slack, Google Voice, and Salesforce. None of these systems were used to document or decide Ms. Webb's accommodation request or termination. Moreover, they are not materials that are part of an employee's personnel file. Consistent with normal practice, when Ms. Webb's employment ended in August 2021, Mia Aesthetics terminated her access to all company electronic systems in due course as standard IT security measures applied to every departing employee. These actions were not aimed at deleting data; they were simply to prevent any unauthorized access going forward, as is company routine policy.

Ms. Webb filed a Charge of Discrimination with the EEOC in late 2021, and Mia Aesthetics first received notice of this charge on or about December 29, 2021. Upon learning of the charge, Mia Aesthetics ensured that Ms. Webb's personnel file as described above remained preserved as required.

During the EEOC's pre-suit investigation of Ms. Webb's charge (which spanned from late 2021 through 2022 and into 2023), the EEOC requested relevant documents in Ms. Webb's personnel file, which was produced to it. EEOC never

sent a preservation letter or request to preserve any documents or materials beyond the personnel file of Ms. Webb that was produced to it. Certainly, the EEOC never sent a preservation letter or request that Mia Aesthetics produce, preserve, or collect all of Ms. Webb's emails, Slack messages, Google Voice texts, or Salesforce logs.

In fact, after Mia Aesthetics Clinic ATL LLC provided the EEOC with the personnel records relevant to Ms. Webb's request for accommodation, the interactive process, and her decision to terminate her employment,[1] the EEOC requested only a copy of the time and attendance policy and a copy of the Reasonable Accommodation policy.[2] Moreover, the EEOC conducted onsite interviews with Mia Aesthetics Clinic ATL LLC's cooperation, at which time it requested only one additional document, namely, the telework policy implemented in December of 2021, which was produced to the EEOC.[3]

The very first time the EEOC indicated any interest in all of Ms. Webb's emails, Slack messages, Google Voice records, and Salesforce data was in November 2024—over three years after Ms. Webb's departure and well into the federal litigation discovery process, of which the Court is fully aware.

---

[1] *See* Mia Aesthetics Clinic ATL LLC's position statement with exhibits, attached as Exhibit B.

[2] *See* EEOC's request for information letter dated February 28, 2023, asking for these documents, attached as Exhibit C.

[3] *See* undersigned counsel's email to the EEOC investigator dated March 22, 2023, producing the additional requested document, attached as Exhibit D.

Defendants, in good faith, did everything the Court ordered and more in reference to the EEOC's requests. They retained an independent e-discovery vendor (LSP Data Solutions) as directed, diligently searched every system and platform at issue, and provided the EEOC with a detailed explanation of those efforts in undersigned counsel's September 25, 2025 letter. The result of these renewed efforts—a supplemental production of 22 responsive emails (21 of which were new)— is not evidence of Defendants' non-compliance; it is proof that nothing else could be found because nothing else exists. Indeed, the sworn declaration of LSP Data Solutions' co-founder, Shawn Huston, attached as Exhibit A, confirms that exhaustive searches were conducted across all four data categories (Salesforce, email, Google Voice, and Slack) and that no additional responsive data is in Defendants' possession or control, or even recoverable. In short, Defendants have exceeded their obligations, only to be met with the EEOC's scorn and baseless accusations.

The EEOC's objections read as a study in bad faith projection. It complains that Defendants' explanations are "self-serving" and "conclusory" even as EEOC brazenly ignores the detailed proof documenting exactly how and why certain electronically stored information (ESI) is unavailable, starting with the fact that neither EEOC nor Ms. Webb ever requested their preservation. EEOC decries the lack of Slack messages, Google Voice data, and Salesforce records while knowing

full well—because Defendants told them, repeatedly—that those materials could not be preserved or retrieved once the relevant accounts were deactivated under normal business operations. EEOC's obsessive hunt for imagined discovery misconduct has wasted enough of the parties' and Court's time, and the Court should not allow the EEOC to convert ordinary data retention practices into a federal case of spoliation.

Defendants complied with their preservation obligations by preserving Ms. Webb's personnel records, which they produced to EEOC in the course of the pre-suit investigation. Even if Defendants had neglected to preserve materials that are considered personnel records—which they did not—the law is clear that mere negligence or adherence to routine business protocols is not sanctionable, absent evidence of an intent to deprive or bad faith.

Here, the EEOC offers no proof of any such intent—no directive that evidence be destroyed, no witness testimony of willful deletion, nothing. All the EEOC can show is that some ESI that once existed (although the content of which is unknown, and largely—including Slack and Google Voice data—has always been unknown to Defendants) and is now gone—which is precisely what Defendants have openly acknowledged from the start. The EEOC's position boils down to the absurd insinuation that Defendants should have anticipated, years ago, that every single email Ms. Webb sent, every single Slack chat, Google Voice text, or Salesforce log *might* someday be demanded in litigation, and therefore should have preserved

or even mined those records indefinitely "just in case." That is not, and has never been, the standard for preservation.

Defendants preserved what they were required to preserve: "***personnel or employment record made or kept by an employer*** (including but not necessarily limited to requests for reasonable accommodation, application forms submitted by applicants and other records having to do with hiring, promotion, demotion, transfer, lay-off or termination, rates of pay or other terms of compensation, and selection for training or apprenticeship)." 29 C.F.R. § 1602.14 (emphasis added). Specifically, Defendants preserved—and produced to EEOC—the documents reasonably relevant to be included in the personnel file, like the communications and records directly concerning Ms. Webb's accommodation request and termination. The EEOC's after-the-fact wish that other ancillary data had been kept (to fuel a speculative fishing expedition) is not a valid basis for sanctions.

In sum, the EEOC's objections are meritless and should be overruled in their entirety. Defendants have complied with the Court's Order to the letter and in good faith. By contrast, it is the EEOC's conduct—its undue delay, its gamesmanship, and its unsupported accusations—that threatens to derail this case from a focus on the merits. Defendants respectfully urge the Court to put a decisive end to this abusive sideshow: the EEOC's objections should be rejected outright, and no further inquiry or burden should be imposed on Defendants regarding these issues.

**ARGUMENT**

**I.    Defendants Complied Fully with the Court's August 18 Order Through a Diligent, Good-Faith Search that Yielded All Recoverable Material.**

The EEOC's Objections paint a misleading picture of Defendants violating discovery obligations, but the truth tells a very different story. In accordance with the Court's August 18, 2025 Order (ECF 51), Defendants undertook an extensive, good-faith effort—carried out, supervised, and/or aided by a third-party e-discovery expert—to "recover or restore any relevant and responsive materials" from four data sources: Salesforce, emails, Google Voice, and Slack. Defendants did exactly that, and documented their process in detail.

Defendants hired an independent e-discovery vendor. Defendants engaged LSP Data Solutions, an experienced e-discovery firm, to assist in renewed searches for the specified data. LSP's Co-Founder, Shawn Huston (CEDS) (and his team), personally worked with Defendants' undersigned counsel to devise and execute a comprehensive search plan. This was no half-hearted attempt—it was a serious, expert-guided endeavor.

Firstly, Defendants re-examined all available email repositories for the relevant time frame. Directed by LSP's assistance, Defendants provided the archived email mailbox data (in .PST format) for April–August 16, 2021 (the period leading

-11-

up to Ms. Webb's termination).[4] These searches *did* uncover some additional emails that had not been previously produced, and Defendants promptly produced all 22 such emails (totaling 44 pages) to the EEOC in the supplemental production.

Fourteen of these emails filled minor gaps in an existing thread regarding Ms. Webb's remote work situation, and one email turned out to be a duplicate of a prior production. Significantly, during the meet and confer efforts between the parties, Defendants agreed to EEOC's list of custodians for the emails search. Defendants' renewed search *did not leave out any custodian or data source that still existed*. The EEOC complains that no emails were produced for certain custodians (e.g. Heather Hardy, Jonathan Escobar, and Viviana Morales), but fails to mention the obvious reason: any emails those individuals once had relevant to Ms. Webb were in the *very same* decommissioned Google Workspace system that no longer exists, or, those individuals never had substantive communications with Ms. Webb—all of which has been previously established and accepted by the EEOC, only for it to mention this now to muddle the issues.

Defendants cannot retrieve what Google itself has deleted. The trivial number of "new" emails (which have nothing to add to the merits of the case) is not proof of

---

[4] The undersigned counsel's letter of September 25 incorrectly left out the "6" in August 16, 2021. Had EEOC sought to confer prior to filing its Objections, that would have been immediately clarified. To be sure, the third party e-discovery vendor has attested in Exhibit A that the search included this time period through August 16, 2021 (not merely through August 1, 2021).

an inadequate search—it is evidence that Defendants had already produced the core communications and that few additional emails ever existed to begin with.

Defendants did exactly what the Court asked: they re-opened the storage room, looked again with expert help, and turned over everything responsive that was found. That nothing earth-shattering emerged only confirms Defendants had been truthful all along when they previously reported that the relevant email accounts were no longer accessible after the company's 2023 migration from Google to Microsoft.

Secondly, Defendants, with LSP's and undersigned counsel's oversight, ran targeted searches within the Salesforce platform for any data referencing Ms. Webb. They searched accounts, opportunities, appointments, operations, payments, invoices—every logical place where Ms. Webb's activities might appear. Each search yielded no information for Ms. Webb, confirming that no Salesforce records of her work (such as online sales consultations or customer interactions) were retained in the system, given that at the time of her employment, her employer was not collecting and storing such information.

Not stopping there, Defendants, through undersigned counsel personally, went the extra mile by contacting Salesforce representatives to inquire about any possibility of recovering historical data for Ms. Webb's inactive account. Multiple Salesforce support personnel uniformly confirmed that no data could be retrieved

for an account inactive beyond six months, absent some prior backup. In other words, by 2022 any trace of Ms. Webb's Salesforce activity was irretrievably gone, unless Defendants had proactively saved it earlier (which they had no reason or requirement to do). Indeed, in the September 25, 2025 correspondence, the undersigned explained to the EEOC that Defendants never saved that Salesforce information at the time of Ms. Webb's departure. Consequently, as counsel explained, "there are no additional documents to produce evidencing the rate of online consultations, Ms. Webb's sales, or Ms. Webb's time-stamped interactions . . . logged by Salesforce." This transparent explanation (which is not a wrongdoing) is why the Court-ordered search yielded no Salesforce data.

Thirdly, Defendants undertook a renewed attempt to recover any Google Voice messages for Ms. Webb, even while knowing the outlook was bleak, and unfortunately it was. As the LSP affidavit explains, Google Voice data is tied to the user's Google Workspace account and cannot be accessed once that account (or the entire Google Workspace domain) is terminated. Users or admins can export Google Voice records via Google Takeout *only while the account is active*; once the subscription is cancelled and the domain deleted, all user accounts and their content are permanently purged by Google from its servers. Google itself warns administrators that after cancellation, user data will be deleted and "cannot be restored." Despite the EEOC's previously misguided statements about this, even

-14-

Google's own eDiscovery tool (Vault) cannot save data beyond a brief 20-day grace period after account deletion.

Here, Mia Aesthetics terminated its Google Workspace subscription in 2023 and deleted the domain, long after Ms. Webb's employment ended. Necessarily, "all Voice content (texts, call logs, voicemails) that resided in those Google accounts was wiped out by Google as part of that process. In fact, Ms. Webb's Google Voice number itself ceased to exist upon her termination in August 2021, when her user account was likely deactivated. Defendants confirmed these technical realities in their letter to the EEOC, making clear that Ms. Webb's Google Voice data simply no longer exists. No amount of forensic vendor effort could change that.

The EEOC's insinuation that Defendants should have somehow "preserved" ephemeral Google Voice text messages years ago (when no one—including the EEOC and Ms. Webb—ever requested them) is unrealistic and contrary to how Google's system works. Defendants cannot produce or restore data that Google itself has permanently deleted, and it is patently unfair for the EEOC to suggest sanctions on this basis.

Lastly, even though they never had it in their possession and while it was not accessible to Defendants during Ms. Webb's employment, Defendants' diligently inquired about the Slack data. Defendants researched Slack's data retention settings and confirmed that on the free Slack workspace plan, messages older than one year

-15-

are automatically deleted on a rolling basis. This aligned with LSP's expert knowledge as well. Given that Ms. Webb's employment (and thus any Slack usage by her) ended in August 2021, any Slack communications involving her would have been automatically purged by Slack around August 2022—over *three years* before the Court's Order (or even the EEOC's initial request) in question.

Despite this, Defendants did not shrug and give up. Undersigned counsel reached out to Slack through multiple channels (including Slack's legal compliance address) to inquire if any data could still be recovered. In response, Slack provided Defendants a special temporary ability to export all of the Slack channel and direct message data from the company's workspace. Defendants followed Slack's instructions, exported the Slack data, and searched it thoroughly for any reference to Ms. Webb. None of Ms. Webb's Slack messages were found. This outcome is hardly surprising, since by 2025, any messages she sent in 2021 had long since vanished under the Slack one-year retention limit.

Still, refusing to leave any stone unturned, Defendants' counsel went back to Slack yet again, asking if *any other* means existed to retrieve Ms. Webb's Slack conversations (perhaps from backend archives not accessible via export). Slack confirmed that no further data was available.

In sum, Defendants literally did everything the EEOC now says they *should* have done: they engaged with Slack, obtained an export of the entire

workspace, and confirmed that Ms. Webb's data was gone. The EEOC's suggestion that Defendants should have performed these steps earlier (e.g. in early 2022, shortly after Ms. Webb's termination) ignores that at that time no one had requested these messages and Defendants had no reason to suspect that informal team chats would later be deemed critical evidence by the EEOC. Regardless, by the time the EEOC finally asked for Slack data, the messages were unrecoverable—a fact that Defendants verified through extraordinary efforts. There is simply nothing more that could have been produced.

In light of the above, the EEOC's accusation that Defendants' supplemental production was incomplete or inadequate is utterly unfounded. Defendants left no stone unturned in their Court-mandated renewed search. The scarcity of newly produced material is not due to any obstruction by Defendants; it is the natural consequence of the technical realities and the passage of time. Defendants cannot come up with data that no longer exists.

Moreover, Defendants did not hide or fail to disclose the gaps—on the contrary, they meticulously explained, category by category, why certain data could not be recovered (backed by expert input and even outreach to third-party providers). This level of transparency and diligence reflects good faith compliance, not the bad faith that the EEOC recklessly ascribes. Defendants have thus fully satisfied the Court's Order and their discovery obligations. As the EEOC ironically urges, the

Court should take Defendants "at their word" that no further responsive data exists, and accordingly should deny the EEOC's attempts to impose any sanction or further burden on Defendants.

**II.     The EEOC's Spoliation Accusations Are Meritless— Defendants Preserved and Produced Ms. Webb's Personnel Records; the Documents EEOC Sought in Discovery Are Not Personnel or Employment Records Under C.F.R. § 1602.14; and the EEOC Failed to Establish Any Bad Faith.**

Unable to point to any actual evidence withheld or any specific discovery violation, the EEOC resorts to accusing Defendants of spoliation. The Court should see this for what it is: a desperate litigation tactic unsupported by the facts or the law.

Sanctions for spoliation—especially the severe adverse inference the EEOC seeks—are not warranted here. Under Rule 37(e) and applicable precedent, sanctions may be imposed for loss of ESI only if (1) the ESI "should have been preserved in the anticipation or conduct of litigation," (2) the party "failed to take reasonable steps to preserve it," (3) the information is lost and cannot be restored or replaced, and (4) depending on the remedy sought, either prejudice has resulted (for lesser measures) or the party acted with intent to deprive (for the harsh measures). The EEOC's objections fall short at each step of this analysis. Defendants will address the EEOC's spoliation theory point by point.

**A.     Defendants did not violate any duty to preserve the data at issue.**

The EEOC's premise is that Defendants had an absolute duty to preserve every email, Slack message, Google Voice communication, and Salesforce record ever created during Ms. Webb's employment. The EEOC invokes the general retention regulation, 29 C.F.R. § 1602.14, and notes that a formal Charge of Discrimination was served on December 29, 2021. In the EEOC's view, the notice required preservation of *all* of Ms. Webb's digital data not only reasonable but mandatory. However, this argument vastly overstates the scope of the preservation duty and ignores crucial context.

It is true that employers are required to preserve personnel records relevant to an EEOC charge, and Defendants did so—they retained Ms. Webb's personnel file and all documents pertaining to her request for accommodation and her decision to terminate her employment. Yet, the EEOC asks the Court to punish Defendants' failure to suspend routine operation of various ancillary data systems (Salesforce, Slack, Google Voice, and migration from Google G-Suite to Microsoft 360) in anticipation that the EEOC might—over three years later—demand raw data from those systems to mount a collateral attack on Defendants' decision-making. That is not a standard any litigant—even the EEOC itself—would realistically meet.

Employers are not required to preserve all digital print of an employee created during her employment—in fact, "[e]mployers are not [even] required to keep every single piece of scrap paper that various employees may create during the termination

-19-

process." *Rummery v. Ill. Bell Tel. Co.*, 250 F.3d 553, 558-59 (7th Cir. 2001). Moreover, nothing in §1602.14 identifies all employee emails, Salesforce data, internal Slack chat messages, or Google Voice messages entries as "personnel records." In fact, such data is not customarily part of an employee's personnel file nor considered critical employment records. Here, there is *zero* indication that Ms. Webb's emails, Salesforce login data, Slack messages, or Google Voice texts had any bearing on her accommodation request or her decision to terminate her employment.

Defendants' interactive process with Ms. Webb (the reasonableness of which is the ultimate issue in this case) was based on their assessment that Ms. Webb's job duties could not be performed remotely, not on some analysis of her digital communications or sales figures. Indeed, Defendants have produced the emails and documents that *were* actually considered in the accommodation process—including communications between Ms. Webb and HR about her remote work request, and Defendants' letters regarding her accommodation and separation. Those are the core records one would expect to preserve, and they were preserved and produced.

By contrast, the various data now at issue (Salesforce reports showing the online consultations performed by Ms. Webb, Salesforce recording of the number of in-person consultations performed by Ms. Webb, and after-hours use of Salesforce

by Ms. Webb; all of Ms. Webb's emails with Viviana Morales, Agnes Nunes, Jonathan Escobar, Yolanda Torres, Tanya Rodriguez; Ms. Webb's Slack personal messages; and Google Voice messages) were never viewed at the time as material to the personnel decision. Defendants followed normal protocols as with any employee upon Ms. Webb's departure: her company accounts were closed in due course, and data that was never downloaded or needed in the ordinary course was allowed to lapse. In short, Ms. Webb was not "singled out" for any special deletion; she was treated ordinarily from an IT perspective, and Defendants had no contemporaneous reason to think that routine treatment was improper.

The EEOC protests that "Defendants destroyed data relevant to Ms. Webb's employment as soon as she was terminated and failed to take reasonable opportunities to recover it even after receiving notice of her Charge, in stark violation of their duties under 29 C.F.R. § 1602.14." This rhetoric is long on indignation but short on specifics, leaving unexplained exactly what "relevant" data was "intentionally" destroyed "as soon as she was terminated." Defendants terminated Ms. Webb's access to company systems, yes—as any employer would when an employee leaves. But Defendants did not rush to shred documents or wipe servers to cover up wrongdoing; they simply proceeded with normal account management. In fact, as far as Defendants were concerned, Ms. Webb simply decided to terminate the interactive process and quit her job, which she could not do.

-21-

The only data that became unavailable "as soon as she was terminated" was data tied to her user accounts (Google, Slack, and Salesforce) that naturally expired per those platforms' standard operations. Defendants had no duty to keep those systems running indefinitely on the off-chance that in unforeseen litigation the EEOC one day—overt three years later—would request them.

Notably, the EEOC has not identified a single communication from Ms. Webb in the aftermath of her termination that asked Defendants to preserve any of the data at issue. There was no preservation letter enumerating those data sources—in fact, there was not even an inquiry by the EEOC during the EEOC's years-long pre-suit investigation about that data. By the EEOC's own admission, it did not seek these materials in earnest until November 2024, over *three years* after Ms. Webb left her employment. By then, of course, much of the data was long gone. The EEOC cannot credibly claim that Defendants violated a duty to preserve when the EEOC itself did not even think of requesting this data for so long.

Had the EEOC truly believed, for example, that the data at issue was crucial evidence, it was incumbent on it to raise those issues in a timely manner. Its failure to do so is not a breach of duty by Defendants. It is, rather, decision by the EEOC—perhaps in hindsight a miscalculation—for which the EEOC now seeks to blame Defendants.

To be clear, Defendants reasonably preserved the evidence that any employer in this situation would know to preserve as personnel records: the direct communications and files pertaining to Ms. Webb's accommodation request and termination (emails, letters, etc.), as well as her core personnel records. Defendants did not divine that the EEOC would years later demand, for example, all of Ms. Webb's emails with specific employees, Salesforce login information, or years-old Slack messages (the contents of which the EEOC has not even proffered) or Google Voice text logs—especially when none of those were ever asked about during the EEOC's investigation.

It is easy for the EEOC, with the benefit of hindsight, to assert that Defendants "should have" taken snapshots of certain data, but the law does not require employers to be psychic. It requires them to preserve personnel records, which Defendants did. They cannot be faulted for not preserving what *no one* (again, including the EEOC in the entire pre-suit investigation) hinted might matter until it was far too late.

Moreover, even if one could argue that some duty attached to these data sources once the EEOC charge was filed, the scope of that duty and the timing are important. Ms. Webb's Charge was filed at the very end of 2021. At that time, her Slack messages still existed (and would continue to exist until mid-2022 by Slack's one-year retention) and some Salesforce login data might have been recoverable

(within six months of deactivation—that is, through mid-February 2022). Thus, the EEOC's theory is that Defendants, upon receiving the Charge, should have immediately undertaken extraordinary measures to preserve or retrieve those transient data. Yet the EEOC presents no evidence that it communicated any such expectation to Defendants in early 2022.

Moreover, Defendants, for their part, had no reason to believe that routine business communications or usage logs, which played no role in the communications with Ms. Webb leading to her decision to terminate her employment, fell under the preservation duty in the same way as, say, emails about the accommodation request. At worst, any failure by Defendants to suspend Slack auto-deletion or to scramble for Salesforce data in that early period was a mistaken assumption about relevance. It was not the kind of flagrant disregard of known obligations that justifies sanctions.

Indeed, courts recognize that a duty to preserve evidence is limited to relevant evidence for litigation that is reasonably foreseeable. *See Jones v. United States*, No. 2020-2182, 2022 U.S. App. LEXIS 4204, at *9 (Fed. Cir. Feb. 16, 2022); *Morgan v. Quest Diagnostics Inc.*, No. 2:20-CV-00430 (MEF) (SDA), 2025 LX 435581, at *24 (D.N.J. Sep. 30, 2025). Defendants' conduct was within the bounds of reasonableness given what was known at the time.

In sum, the EEOC's charge that Defendants violated their preservation duty is unfounded. Defendants preserved what they should have, and any arguably lost

data was lost through ordinary business operations before anyone asked for it. That does not give rise to any basis for claiming spoliation nor a basis for requesting adverse inferences.

**B. The EEOC has not been prejudiced by the loss of any data, and any "prejudice" it claims is self-inflicted or speculative.**

Under Rule 37(e)(1), even if some ESI that should have been preserved was lost, a sanction can be imposed only upon a finding of prejudice to the moving party. The EEOC's brief claims that it has been prejudiced in its ability to prove its case, positing that the missing e-mails, Salesforce, Slack, and Google Voice data would have aided its arguments about the feasibility of Ms. Webb working remotely. This claim is unsubstantiated.

The EEOC has had—and still has—the ability to explore the question of remote work feasibility through multiple other sources of evidence. Ms. Webb herself can testify to how she performed her duties and what tools she used. The EEOC has deposed or can depose Ms. Webb's supervisors and co-workers about how work was done and whether being in-office made a difference. Indeed, the EEOC presumably already possesses Ms. Webb's own communications and records from the relevant time (since she was an employee corresponding with management).

The notion that an after-the-fact data dive would produce some smoking-gun metric to prove that remote work was viable is highly speculative. For instance, the

-25-

EEOC argues it wanted Salesforce "data relating to online sales consultations in Defendants' Atlanta office," implying that if a lot of sales were done online, it undercuts Defendants' stance. But Defendants have explained that *no such compiled data exists*—these were not metrics tracked by Defendants in the normal course.

More importantly, whether other employees made sales remotely or not does not definitively answer whether Ms. Webb's job could be effectively performed remotely. That ultimate issue will turn on witness testimony and the nature of her role, not on aggregated Salesforce numbers.

Similarly, any Slack messages Ms. Webb might have sent are unlikely to prove or disprove the core contention in this case. At most, they would show she communicated via Slack—a fact no one disputes. The EEOC's theory seems to be that if Ms. Webb successfully communicated via Slack while at home, it proves remote work was feasible. That is a huge logical leap; Slack messages alone say nothing about whether all aspects of her job (e.g. in-person client consultations, team collaboration, etc.) could be done remotely. In short, the EEOC's claimed prejudice is more a wish for extra impeachment material or marginal data points, rather than a showing that the loss of these ESI sources cripples its case.

Furthermore, to the extent the EEOC is hampered in obtaining evidence from these sources, it largely has itself to blame. The EEOC waited until long after the fact to pursue these lines of inquiry. By the EEOC's own admission, it only sought

this information in November of 2024. At that point, the data had been gone for *years*. If there is any prejudice—which EEOC has not shown—it was the result of the EEOC's own delay, for which it cannot now complain.

The EEOC's delay is particularly inexcusable given that it is the agency charged with enforcing record-preservation rules like §1602.14—it knew or should have known exactly what records an employer must keep post-termination, and for how long. If the data at issue was truly essential, or if it were part of the employee's personnel file, the EEOC could and should have instructed Defendants early on to preserve them or it should have just even requested them before the data vanished. It did not. Thus, any "prejudice" here is not something that should be laid at Defendants' feet.

Finally, even assuming the EEOC has suffered some degree of disadvantage from the absence of this data, the proper remedy would not be a punitive sanction but rather a measured step to cure the prejudice (if any). Rule 37(e)(1) permits only remedies "no greater than necessary to cure the prejudice." Notably, the EEOC never articulates a precise cure for the alleged prejudice short of severe sanctions—it jumps straight to requesting adverse inferences or issue preclusion. But adverse inferences are not "cures"; they are punishments that tilt the playing field. The EEOC's eagerness to leap to such sanctions betrays its real goal: not to neutralize

prejudice, but to obtain a windfall advantage in litigation by blackening Defendants' name. The Court should reject this scheme.

Nowhere is that intent more evident than in the request to preclude the defense that Ms. Webb has history of sporadic unpredictable absences, rendering her not qualified for her job ADA. Nothing about the data at issue has anything to do with Ms. Webb's absences—and the EEOC cannot say otherwise. Yet, the EEOC disingenuously attempts to get this Court to strike that defense even if completely unrelated to any of the issues in discovery.

If the EEOC truly lacks certain evidence, it can make its case with what it has (including witness testimony about those very subjects). Indeed, this Court can ensure the EEOC is not sandbagged by, for example, precluding Defendants from introducing evidence or argument that would *only* be provable by the missing data. But notably, Defendants have no such plan—they are not pointing to Ms. Webb's emails with certain employees, Salesforce data, or Slack or Google Voice records as a sword while hiding them as a shield. Defendants' position is straightforward: Ms Webb has history of sporadic unpredictable absences, which under the law renders her not "qualified" for her job under the ADA; moreover, remote work was infeasible, as evidenced by the nature of the job and the communications that do exist documenting their decision process. These positions position neither hinge on nor are insulated by the lost data. In short, the EEOC's ability to prosecute its case

remains intact, and any marginal gaps are of its own making or of minimal consequence. There is no unfair prejudice warranting sanctions.

### C. There is no evidence whatsoever that Defendants acted with the intent to deprive the EEOC of any information; thus, the EEOC's demand for harsh sanctions is baseless.

Generally, the burden lies with the party seeking sanctions (here, the EEOC) to prove that spoliation occurred and that the prerequisites for sanctions are met. In the Eleventh Circuit and its district courts, "courts have placed the burden to establish the factors on the party seeking the sanctions." *Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 U.S. Dist. LEXIS 204933, at *47 (S.D. Fla. Dec. 4, 2018). *See also Marshall v. DentFirst, P.C.*, 313 F.R.D. 691, 701 (N.D. Ga. 2016) (denying a motion for spoliation because the plaintiff failed to prove the elements of such a claim of spoliation).

The EEOC's brief acknowledges this general rule but cites an out-of-circuit decision, *DR Distributors, LLC v. 21 Century Smoking, Inc.*, which mused that "it seems odd" to require the movant to prove a negative (i.e., that the destroying party failed to preserve evidence properly). In *DR Distributors*, a sanctions case from the Northern District of Illinois, the court noted a concern that placing the full burden on the movant could reward a recalcitrant party for obscuring the facts of what was lost. That court suggested that once a basic showing of loss is made, the burden might shift to the spoliator to show it acted reasonably.

However, no binding Eleventh Circuit authority adopts such a burden-shift. To the contrary, our Circuit's decisions imply the burden remains with the movant. The Eleventh Circuit in *Tesoriero v. Carnival Corp.* (2020) evaluated a plaintiff's request for an adverse inference due to lost evidence and ultimately rejected it because the plaintiff failed to carry her burden of proving the defendant's bad faith. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184-85 (11th Cir. 2020) ("Because plaintiffs produced no evidence that the train company purposefully lost or destroyed the tape, we concluded that there was no showing of bad faith."). Thus, it is the EEOC's burden to establish every element of the claim of spoliation.

The EEOC repeatedly asserts that Defendants acted in "bad faith" in losing the data, effectively accusing them of deliberate spoliation to hide evidence. This is a grave accusation, and it is utterly unsupported by the record. To impose the kind of severe sanctions the EEOC wants (such as an adverse inference), Rule 37(e)(2) requires a finding that the party "acted with the intent to deprive" the opponent of the use of the information. In the Eleventh Circuit, intent to deprive is equivalent to bad faith—an inquiry focusing on whether the loss of evidence was caused by a conscious effort to prevent its use in litigation. The EEOC has put forward nothing that even begins to meet this standard. There is no hint that Defendants ever believed the missing data would harm their case, let alone that they schemed to destroy it. On the contrary, Defendants have been transparent about what was lost and how. They

-30-

did not try to cover up the gaps; they disclosed them. That is the antithesis of a bad-faith actor.

It is relevant to consider the timeline—most of the "lost" data disappeared through automatic processes (Slack auto-delete, Google account deletion, Salesforce deactivation, email migration) well *before* this lawsuit was filed or even seriously contemplated by Defendants. For Defendants to have intentionally caused those losses *in bad faith*, one would have to indulge a fantasy in which Defendants, in mid-2021, presciently worried that Ms. Webb's data might someday undercut their position that her job couldn't be done remotely (and, presumably, that her absences rendered her not qualified for the job under the ADA)— so they maliciously let that data delete itself. That is an absurd and unsupported conclusion.

Defendants had no reason at that time to suspect that such data would be requested or would be remotely relevant. The EEOC's theory assumes Defendants had a crystal ball and a guilty conscience, essentially thinking: "Even though we sincerely believe remote work is infeasible (and have nothing to hide), let's imagine what evidence the EEOC could use to rebut us, and then proactively let it be destroyed years before they ask." Such a scenario is not just implausible, but is imaginary. Nothing in the evidence suggests Defendants harbored any such intent.

Instead, the evidence shows Defendants acted consistently and honestly. They implemented normal retention policies, and when called upon by the Court, they

endeavored in good faith to recover whatever had been lost. Far from "hiding" any of this, Defendants have detailed exactly what transpired with each data source.

Tellingly, the EEOC can cite no direct evidence of bad faith—no witness, no document—and instead tries to infer bad intent from the mere fact of loss. But inference of intent requires that the circumstances "cannot be credibly explained as not involving bad faith." Here, not only can Defendants' conduct be credibly explained as good faith, it has been so explained, with robust support. All of the loss can be explained by benign reasons: system limitations, ordinary off-boarding of an ex-employee, and the EEOC's own delay. The EEOC simply refuses to accept those explanations, labeling them "self-serving, conclusory assertions." There is nothing "conclusory" about citing Slack's own policies and actions, or Google's documented deletion protocols, or undersigned counsel's efforts with Salesforce, or the third-party e-discovery vendor's efforts in production of emails. These are objective facts. The EEOC's willful blindness to these facts does not transform them into evidence of bad faith.

In short, the EEOC has failed to carry its heavy burden of showing intentional spoliation. Mere negligence in losing or destroying evidence is not enough to warrant sanctions. *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) ("Spoliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence.").

The cases cited by the EEOC do not support its position. The EEOC cites to *Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290 (11th Cir. 2023), to argue that Defendants here similarly failed to take reasonable steps, perhaps implying an inference of intent. However, Skanska is factually distinguishable. There, litigation was not only foreseeable, it was ongoing (a lawsuit over a bridge collapse) in the course of which Skanska let key evidence be destroyed, with no cogent explanation for besides bad faith. In contract, the loss occurred long before any litigation and any loss of data was thoroughly explained as the result of routine operations, not a scheme to hide evidence. Moreover, *Skanska* dealt with messages contemporaneous to a pivotal event (the bridge allision), whereas in this case, the information EEOC sought years after the termination of Ms. Webb's employment has not even shown (merely supposed) to be central to the issues in the case.

Moreover, *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184-85 (11th Cir. 2020), actually cuts against the EEOC because it requires the movant to carry the burden of proof, and highlights that spoliation sanctions, like inferences that the EEOC asks for are not appropriate in the absence of actual proof of bad faith.

Even if one charitably viewed Defendants' handling of the ESI as negligent (which Defendants firmly dispute, given the reasonableness of their actions), that is still far from the level of culpability needed for an adverse inference or similar sanction. Courts reserve such severe measures for instances of egregious, intentional

evidence destruction—not for scenarios where data vanished as a byproduct of routine operations and no one specifically asked for its preservation. This is precisely why Rule 37(e) created a two-tier framework, cabining harsh sanctions to cases of intentional deprivation. The EEOC's attempt to blur this line and equate ordinary data loss with bad faith should be rejected.

## CONCLUSION

Defendants have complied fully and faithfully with the Court's August 18, 2025 Order and with their discovery obligations. The first requested by the EEOC nearly three years after the Charge was not preserved for the simple reasons that it largely was never in Defendants' possession beyond the routine operation of third-party systems, and no one ever asked for it until long after it had vanished. Defendants nevertheless undertook beyond reasonable efforts to attempt retrieval of that data—not to stave off sanctions or cover up wrongdoing, but to comply with this Court's Order which was prompted by the EEOC's bare allegations, and to put this matter to rest and move on to the merits. Those efforts confirmed what Defendants have said all along: there is nothing more to produce. The EEOC's objections are factually baseless and legally unsupportable. They are the last gasp of a campaign of delay and harassment that has run its course.

-34-

Defendants respectfully urge the Court to overrule the EEOC's objections in their entirety and put an end to the EEOC's abusive discovery crusade. No adverse inferences are warranted. No further inquiry or burden should be imposed on Defendants regarding these issues. This matter should now return to the proper focus: the merits of Ms. Webb's claims, to be decided on admissible evidence rather than on insinuations about evidence that never existed.

Respectfully submitted this 8th day of December, 2025.

/s/ Joan Carlos Wizel
Joan Carlos Wizel (*pro hac vice*)
Llopiz Wizel LLP
1451 W Cypress Creek Rd 300
Fort Lauderdale FL 33309
T: (754) 312-7389
jcw@l-wfirm.com
glb@l-wfirm.com

Betsy Bulat, Esq.
Georgia Bar No. 558428
Matthew D. Treco, Esq.
Georgia Bar No. 802181
Martenson, Hasbrouck & Simon LLP
2573 Apple Valley Road NE
Atlanta, Georgia 30319
T: (404) 909-8100
F: (404) 909-8120
bbulat@martensonlaw.com
MTreco@martensonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on December 8, 2025, electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Joan Carlos Wizel
Joan Carlos Wizel
